James **FOSTON**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 18830.

United States Court of Appeals Eighth Circuit.

Feb. 13, 1968.

Gordon G. Hartweger, St. Louis, Mo., for appellant and filed brief.

Robert H. Kubie, Asst. U. S. Atty., St. Louis, Mo., for appellee; Veryl L. Riddle, U. S. Atty., was with Robert H. Kubie, St. Louis, Mo., on the brief.

Before VAN OOSTERHOUT, ME-HAFFY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The defendant, nineteen years of age, was indicted and tried before a jury on two counts: (I) unlawfully having in his possession a United States treasury check which had been stolen from the United States mails, knowing that the check had been stolen, in violation of 18 U.S.C. § 1708 (1964 ed.); (II) causing the check to be uttered and published as true with intent to defraud the United States, knowing at the time that the check was falsely altered and forged, in violation of 18 U.S.C. § 495 (1964 ed.). He was found guilty and sentenced under the Youth Correction Act, 18 U.S.C. § 5010(b) (1964 ed.).[1] He appeals, contending that the District Court erred in overruling his motion for a judgment of acquittal and that it improperly instructed the jury.

In Kotz v. United States, 353 F. 2d 312 (8th Cir. 1965),[2] this Court held that a sentence is not invalid under the Youth Correction Act because it may operate to subject a youthful offender to a longer period of restraint (six years) than that provided for the offense statute which he has violated (five years under Count I). Thus if Count I can be sustained, and it can, we need not consider the defendant's objections with respect to Count II. Cf., Isaacs v. United States, 301 F.2d 706 (8th Cir.), cert. denied, 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58 (1962); Barnes v. United States, 197 F. 2d 271 (8th Cir. 1952).

We first consider the defendant's contention that the evidence was not sufficient to justify the conviction on Count I.

Annie Underwood, a Social Security recipient, testified as follows. Her Social Security check was regularly delivered and placed in her mailbox at 2131 Division Street, St. Louis, Missouri, on the third day of each month. On returning from work on Thursday, November 3, 1966, she found that her mailbox had been broken open and was empty. She never received the expected check. Neither of the two "Annie Underwood" sig-

---

1. "THE COURT: I am going to impose an indefinite sentence under the Youth Correction Act on you which permits the Attorney General to keep you under his supervision for a total of six years. Normally the way this thing works is that they give you an education. They teach you a trade, and then if you conduct yourself properly, if your conduct is good and you are responsive to that, they turn you out after a six months period. That is the normal way it works. That is under 18 U.S.C. [5010b]."

2. Accord, Eller v. United States, 327 F.2d 639 (9th Cir. 1964); Rogers v. United States, 326 F.2d 56, 57 (10th Cir. 1963); Carter v. United States, 306 F.2d 283 (D.C.Cir. 1962); Cunningham v. United States, 256 F.2d 467 (5th Cir. 1958). But cf., Pilkington v. United States, 315 F.2d 204 (4th Cir. 1963).

The Cunningham Court outlined the rationale of the decisions:

"* * * [T]he Youth Corrections Act * * * is designed to provide

[youths] with correctional treatment looking to their complete rehabilitation in lieu of punishment, that is with preventive guidance and training, and all of its provisions are designed, enacted and enforced with that end in view."

256 F.2d at 471–472. See also, Remarks of Director of Bureau of Prisons, 27 F.R.D. 356; Remarks of Executive Assistant, Criminal Division, Department of Justice, 26 F.R.D. 261.

We would add that upon the unconditional discharge of a youth offender, his conviction is automatically set aside and a certificate to that effect is issued to the youthful offender, 18 U.S.C. § 5021 (1964 ed.), and that for those offenders who are conditionally released but who fail to complete their rehabilitation and are again subject to restraint, the time spent on probation is included in determining their unconditional discharge date. 18 U.S.C. § 5017(d) (1964 ed.).

natures on the reverse side of the check had been written by her.

Margie Hubbard's testimony may be summarized as follows. She knew the defendant three or four years, and saw him on November 4, 1966, at approximately three o'clock in the afternoon at "Mary's Cafe." At that time, the defendant had in his possession a Social Security check made out to "Annie Underwood." He told her "he broke in a mailbox on Division and got it." He asked her whether she knew where she could cash the check and she answered, "Over on Washington Avenue, over at the Exchange." The defendant then gave her the check which she took to the Service Exchange, accompanied by the defendant, Willie Spence and a third man. Willie Spence and the third man went into the Exchange with her. She signed Annie Underwood's name on the reverse side of the check, and attempted to cash it. She, Willie Spence and the third man were arrested at the Exchange. The defendant ran away before he could be apprehended.

The defendant's testimony may be summarized as follows. He had been in "Howard's Castle," known to Margie Hubbard as "Mary's Cafe," at about 2:15 P. M., on November 4th; and at that time, a man named "Bennie" asked him to cash a check. He looked at the check and told him "no, because it was a woman's check." Bennie then asked him "did I know any woman in the place, a woman. I told him no at first, then I looked around. I looked in the back. Margie and a couple of people was back there, * * * so I called Margie and I told her this fellow wanted to speak to her. Just when they started talking I turned around and looked out the window. A few minutes later I left." He further testified that he did not accompany Margie to the Exchange, but went to the home of a friend.

The friend testified and corroborated the defendant's alibi.

The fingerprints of the defendant were found on the check and were identified by experts as being those of the defend-

ant. Numerous other unidentified fingerprints were also found on the check.

Two bystanders testified that they saw a man running through an adjacent parking lot at about the time that Margie Hubbard and the two other men were arrested. As they were unable to identify the man as the defendant, we do not view their testimony as having any probative value.

The conviction of the defendant on Count I thus rests squarely on the testimony of the accomplice, Margie Hubbard, that the defendant told her that he had stolen the check, and that he had given it to her to have it cashed.

The defendant, recognizing this, attacks the credibility of Margie Hubbard. He urges that her testimony was not subject to belief because: she was promised and given immunity for testifying; she was a woman of low intelligence; she was inconsistent in her testimony; she was motivated to implicate the defendant by a desire to protect Willie Spence.

The defendant also urges that his testimony is entitled to credence because: he had no motive to steal the check as he had quit his job on November 3rd, and had been paid in full; he had an alibi witness to prove that he had not, in fact, been outside the Service Exchange when the check was cashed; the fingerprints on the check were not significant in view of his admission that he had held the check briefly upon being requested to cash it.

The prosecution, on the other hand, attacks the defendant's credibility through the testimony of Secret Service Agents who interviewed him on November 5, 1966. They testified that the defendant then claimed he had never seen the check, that it had been several months since he had seen Margie Hubbard and that he was unable to recognize Margie Hubbard from a picture shown to him. The Agents conceded that the attitude of the defendant during the interrogation had been cooperative, and that he had consented to have his fingerprints taken.

In reviewing the sufficiency of the evidence, we view it, as we must, in the light most favorable to the prosecution. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Whiteside v. United States, 346 F.2d 500 (8th Cir. 1965), cert. denied, 384 U.S. 1023, 86 S.Ct. 1946, 16 L.Ed.2d 1025 (1966); Zacher v. United States, 227 F.2d 219 (8th Cir. 1955), cert. denied, 350 U.S. 993, 76 S.Ct. 542, 100 L.Ed. 858 (1956). It is not for us to determine the credibility of a witness, even though that witness may be an accomplice. Glasser v. United States, supra; Caminetti v. United States, 242 U.S. 470, 495, 37 S.Ct. 192, 61 L.Ed. 442 (1917). While the testimony of an accomplice must be carefully weighed before it is given credence, we cannot substitute our judgment for that of the jury, particularly where, as here, the jury was properly cautioned as to the reliability of such testimony.[3]

While a careful review of the record supports the defendant's contention that Margie Hubbard was a witness of low intelligence, who was frequently led by counsel for prosecution, the defendant's contentions that her testimony was induced by threats or promises, or that it was motivated by a desire to protect Willie Spence is not supported by substantial evidence. The alleged inducement did not occur until after November 4, 1966, the date she first gave a statement to agents of the Secret Service implicating the defendant, Willie Spence and herself. Her statement on that date closely paralleled her testimony at the trial. She told the Agents: "On 11–4–66 I was sitting in Howard Castle on Franklin Avenue, a restaurant, when a man called James (last name not known) whose sister is Pearlie May who lives at 2210 Cass, Apartment 1101, came into the restaurant and asked if I could get a check cashed for him. I asked him where he got it and he said 'a mailbox on Division.' I told him that I would try to cash the check. * * * " Under such circumstances, the jury was justified in accepting her testimony.

On the other hand, we cannot say that the jury erred in refusing to believe the defendant's story as to how his fingerprints were imprinted on the check.

His statement at trial was totally at odds with an oral statement he gave to Secret Service Agents on November 5, 1966. On being shown Annie Underwood's check on that occasion, the defendant denied having previously seen it. He also denied having seen Margie Hubbard in "Mary's Cafe" on November 4, 1966. He admitted to these facts some time later and then only after he had been told that his fingerprints had been clearly identified as being on the check.

The defendant further contends that the evidence is insufficient to sustain Count I in that it fails to show that the check had been stolen from the United States mails. He urges that direct testimony was required to show that the check had, in fact, been deposited in the mails by the Post Office Department. The short answer to this contention is that the jury was free to, and obviously did, believe Margie Hubbard's testimony that the defendant had told her that he took the check from Annie Underwood's mailbox. In addition, there was substantial

3. " * * * [T]he testimony of an accomplice is competent evidence, and the credibility of such an accomplice is for the jury to pass upon as they pass upon the credibility of any other witness. The testimony of an accomplice must be received with great caution, but if the testimony carries conviction and the jury are convinced of its truth they should give it the same weight as would be given to the testimony of a witness who is in no respect implicated in the offense. "While it is a rule of law that a person accused of crime may be convicted upon the uncorroborated testimony of an accomplice, still a jury should always act upon such testimony with great care and caution, and subject it to careful examination, in the light of all other evidence in the case; and the jury ought not to convict upon such testimony alone, unless, after a careful examination of such testimony they are satisfied beyond a reasonable doubt of its truth, and that they can safely rely upon it."

No exception was taken to this instruction by the defendant.

evidence from which the jury could properly infer that the check had, in fact, been placed in the mails.

Finally, the defendant contends that the trial court erred in failing to instruct the jury that it was necessary for it to find that the check had been stolen from the United States mails. He points to a paragraph in the instructions to support his contention:

"If the jury should find beyond a reasonable doubt from the evidence in the case that the United States Treasury check described in the indictment was *stolen* and that, while recently stolen, the property was in the possession of the accused, the jury would ordinarily be justified in drawing from those facts the inference, not only that the United States Treasury check was possessed by the accused with knowledge that the property was stolen, but also that the accused participated in some way in the theft of the property, unless possession of the recently stolen property by the accused is explained to the satisfaction of the jury by other facts and circumstances in evidence in the case." (Emphasis added.)

The defendant argues, in substance, that the words "from the United States mails" ought to have been inserted after the word *"stolen"* in the fourth sentence of the instruction, or elsewhere in that paragraph, to make it clear to the jury that it was necessary for them to find out only that the check had been stolen, but that it had been stolen from the United States mails.

■ While it was necessary for the Court to instruct the jury that it must find that the check had been stolen from the United States mails, it was not necessary for the trial court to do so in the paragraph referred to. The Court made it perfectly clear, in at least three other paragraphs in the instructions, that it was incumbent on the prosecution to prove that the check had been stolen from the United States mails to sustain the charge. It was not necessary for the court to do so a fourth time.

Affirmed.